IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| UNITED STATES OF AMERICA | ) | Criminal No.   1:24-cr-00356-AMN |
|---|---|---|
| v. | ) | |
| | ) | GOVERNMENT'S SENTENCING MEMORANDUM |
| Kristin Keeble, a.k.a. "Betty Belk," | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America, by and through its counsel of record, the United States Attorney for the Northern District of New York, hereby requests that the Court sentence the defendant Kristin Keeble according to the Sentencing Guidelines and recommends that the Court impose a low-end Guideline term of 5 months of imprisonment, followed by at least three years of supervised release that includes at least 5 months of home detention. Such a sentence would be sufficient, but not greater than necessary, to comply with the sentencing factors set forth in 18 U.S.C. § 3553(a).

I.      **FACTUAL BACKGROUND**[1]

On November 8, 2024, the defendant waived indictment and pled guilty, pursuant to a plea agreement, to a one-count information charging Interstate Communications with Threat to Injure, in violation of 18 U.S.C. § 875(c). Dkt. 27 (Information); Dkt. 29 (Plea Agreement).

In pleading guilty, Keeble admitted that on October 26, 2023, she sent four audio Facebook messages, using a Facebook account in the name of a pseudonym "Betty Belk" to a victim in Catskill, New York with initials S.B. ("Victim"). PSIR ¶ 6.

---

[1] The United States adopts the facts contained in the Presentence Investigation Report prepared by the U.S. Probation Office, which in turn relied upon law enforcement reports and related discovery provided by the United States.

The audio messages were laden with racial slurs, often focusing on the Victim's Facebook profile picture which depicted him, a black male, and white female friend. PSIR ¶ 7. In the first audio message, Keeble sent a 10-second recording stating, "Hey you fucking nigger! Quit fucking with people on the Internet before we hang your fucking monkey motherfucking ass by your black fucking African balls you fucking nigger fucking bitch." PSIR ¶ 8.

In the second audio message, Keeble directed racial slurs and threats towards the Victim, stating, "Messing with that poor girl on that you fucking African fucking fuck. Are you here illegally motherfucker? Just wait till Trump comes back. We're gonna have you deported to your African fucking jungle you monkey scratching ball fucking black motherfucker." PSIR ¶ 9.

That was followed by an 11-second audio message, in which Keeble directly threatened to hang the Victim, his family, and seemingly his white female friend depicted in his profile photo, stating, "Inbred ass fucking nigger fucking that fat fucking white bitch we're gonna hang that fucking whore from the tree to with you bitch and your nigger fucking mixed kids." PSIR ¶ 10.

Keeble concluded her messaging spree by implying to the Victim she could make good on her threats, due to her self-purported ties to white supremacy groups, stating in relevant part, "You better watch who the fuck you fucking with up on these motherfuckers you know us clan members run deep bitch and we protect our fucking white women, not that fat white bitch you're with, but we protect our motherfuckers on Facebook from African fucking monkeys like you." PSIR ¶ 11. Keeble also warned the Victim not to go to law enforcement and reaffirmed her claims she had ties to white supremacists, stating: "Who you gonna call CPS on bitch? I'll call my goddam grand Ku Klux Klan[2] motherfucker, top for the fucking trees bitch comedown on your fucking African

---

[2] The Ku Klux Klan (KKK) is an American Protestant-led extremist, white supremacist, and far-right hate group that originated in 1865 at the end of the Civil War. *See KKK Series*, FBI https://www.fbi.gov/history/famous-cases/kkk-series (last visited July 1, 2025).

2

fucking head motherfucker."[3] *Id.*

Following the Victim discovering and listening to the messages, he feared for his safety along with that of his friends and family. PSIR ¶ 12. While the audio messages were the first instances of direct communication between Keeble and the Victim, the Victim has been tangentially aware of the Betty Belk account due to their mutual membership in a Facebook group. PSIR ¶ 7. By virtue of the Victim's public profile, Keeble was able to send him audio messages for the purpose of issuing threats, knowing the Victim would receive them and perceive them to be threats. PSIR ¶ 13.

The defendant was arrested on March 13, 2024, and has been on pre-trial supervision since then. PSIR ¶ 4. To date, the defendant has not had any known issues of noncompliance. *Id.*

## II.    APPLICABLE STATUTORY AND GUIDELINES PROVISIONS

### a. Guidelines Provisions

#### i. Criminal History Category

The United States agrees with Probation that the defendant has a total criminal history score of zero, which establishes a criminal history category of I. PSIR ¶ 43.

#### ii. Offense Level Computation

The United States agrees with the Probation Office's offense level computation, including the application of an upward adjustment because the offense involved more than two threats under U.S.S.G. § 2A6.1(b)(2)(A). PSIR ¶¶ 19-20.

Pursuant to § 2A6.1(b)(2), a two-level enhancement to a defendant's base offense level is warranted if "the offense involved more than two threats." U.S.S.G. § 2A6.1(b)(2). "It is generally understood that threats are counted under § 2A6.1(b)(2) based on the number of

---

[3] The Government can make copies of the defendant's voicemails available for the Court upon request.

threatening communications" and not the number of threats or the number of victims. *United States v. Parker*, 551 F.3d 1167, 1173 (10th Cir. 2008); *accord United States v. Scott*, 441 F.3d 1322, 1327 (11th Cir. 2006) (three distinct threats in two letters deemed sufficient to apply enhancement); *United States v. Frazer*, 391 F.3d 866, 870–71 (7th Cir. 2004) (a recorded message announcing that bombs were planted in two schools and on a school bus played on three separate phone calls deemed to be more than two threats under U.S.S.G. §2A6.1); *United States v. Stokes,* 347 F.3d 103, 106 (4th Cir. 2003) ("[T]he phrase 'more than two threats,' as used in § 2A6.1(b)(2), refers to the number of threatening communications, not the number of victims threatened."); *United States v. Newell,* 309 F.3d 396, 403 (6th Cir.2002) (recognizing that § 2A6.1(b)(2) takes into account the number of threats made). Because the defendant sent four threatening voicemails, even if they were sent in quick succession to the same victim, the enhancement should apply.

*Wooden v. United States*, 595 U.S. 360 (2022), does not compel a different result. *Wooden* held that burglarizing ten different storage units on a single night counted as only one offense under the Armed Career Criminal Act in a prosecution for illegal possession of firearms and ammunition, not for multiple threatening communications to the same victim. *Id.* at 360. Indeed, Application note 3(B) U.S.S.G. §2A6.1 adds that: "If the offense involved (i) substantially more than two threatening communications to the same victim, (ii) a prolonged period of making harassing communications to the same victim, [or] (iv) multiple victims, an upward departure may be warranted." U.S.S.G. § 2A6.1, cmt. n. 3(B). In the third message, the defendant threatens not just the Victim, but the Victim's friend and their potential children as well. PSIR ¶ 10. If each of those were treated separately, then that threatening audio message alone could be deemed to be multiple threats with multiple victims. Regardless, the four Facebook audio messages were

temporally distinct and should be treated as four distinct threatening communications, which justifies the enhancement under 2A6.1(b)(2).

The Government notes that the Probation Office had originally included a victim-related adjustment under U.S.S.G. § 3A1.1(a) because the defendant's threatening messages contained racial epithets, but later removed that enhancement based on additional discussion with the parties. PSIR at 24. For added context, in order to apply for the hate-crime victim-related adjustment under 3A1.1(a), the government must establish *beyond a reasonable doubt* not only that the defendant chose the victim as a target for criminal activity, but that defendant targeted that particular victim *because of* his actual or perceived race. *See United States v. Hogan*, 121 F.3d 370, 372 (8th Cir. 1997) ("the record cannot support a finding that Hogan targeted the victims because of their vulnerability"); *United States v. Callaway,* 943 F.2d 29, 31–32 (8th Cir.1991) (reversing the district court's imposition of the two-level upward under 3A1.1(a) where the victim—defendant's granddaughter—was an infant, blind, and afflicted with cerebral palsy, but the record did not support a finding that the defendant chose the granddaughter because of her infancy and physical handicaps). While the evidence shows that the defendant used racially derogatory language in her threats, the evidence also shows that the victim and Keeble "had posted in a common Facebook group" and that the defendant threatened the victim after they had already interacted online. PSIR ¶¶ 7, 20 & n.1. As a result, the Government does not believe it could meet its burden to show that the defendant targeted the victim *because of* his race rather than just because of their common association online.

The United States agrees that the defendant is entitled to a two-level downward adjustment of the offense level for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a). PSIR ¶¶ 25. As a result, the government agrees that the total offense level should be 12. PSIR ¶ 27.

5

b. **Guidelines Calculations**

The Government agrees with the Probation Office's guideline calculations. Based upon a total offense level of 10, and a criminal history category of I, the Guidelines recommend 10 to 16 months of imprisonment (within Zone C of the Sentencing Table), between 1 and 3 years of supervised release, and a fine between $5,500 to $55,000. PSIR ¶¶ 74, 78, 83.

Since the applicable guideline range is in Zone C of the Sentencing Table, the minimum term of imprisonment may be satisfied by (1) a sentence of imprisonment; or (2) a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention, provided that at least one-half of the minimum term is satisfied by imprisonment.

### III. GOVERNMENT'S SENTENCING RECOMMENDATION

The United States requests that the Court sentence the defendant according to the Sentencing Guidelines and according to Zone C of the Sentencing Table, to include at least 5 months in prison followed by a three-year term of supervised release that includes at least 5 months of home detention.

Based on her apparent inability to pay, the government does not recommend that the Court impose a fine. *See* PSIR ¶¶ 70-72; U.S.S.G. § 5E1.2(a) (fine may be waived where "defendant establishes that he is unable to pay and is not likely to become able to pay any fine").

**A. The Nature, Circumstances, and Seriousness of the Offense**

The requested sentence to be imposed should reflect the nature and seriousness of the defendant's threats. The seriousness of this crime is highlighted by the number and nature of the messages including her use of a pseudonym and the racially derogatory language used.

*Firstly,* Keeble's conduct was not isolated. The Sentencing Commission recognizes that "offenses covered by this guideline may include a particularly wide range of conduct and that it is not possible to include all of the potentially relevant circumstances in the offense level." U.S.S.G. § 2A6.1, App. N. 4(A). Keeble sent multiple audio messages, via personal chats to the Victim, on the same day, each containing detailed and explicit threats including threats to kill the Victim, his friend, and children executed, either by herself or with the help of the KKK, and to have the Victim forcibly deported from the United States. PSIR ¶¶ 9-11. Moreover, the defendant used a pseudonym of "Betty Belk" rather than her real name to disguise her identity and make it more difficult for the Victim, or law enforcement, to identify her and find her.

*Secondly,* while the government has not included a sentencing enhancement pursuant to §3A1.1(a), the targeted racially derogatory language Keeble used in conveying her threats was notable, particularly considering the harm it has caused the Victim. In his victim impact statement, the Victim disclosed that he had suffered "emotional and psychological trauma" due to Keeble's threats. VIS at 1. The Victim specifically points out the fear that Keeble's purported connections to the Ku Klux Klan caused him. *Id.* Since the threats were levied, the Victim has suffered from anxiety, panic attacks, nightmares and night terrors. *Id.* The Victim been treated by both a therapist and psychiatrist, expenses for which he has had to pay fully out pocket. *Id.* at 1-2. The defendant's threats have significantly and negatively impacted the Victim's mental, physical, and financial wellbeing. *Id.* While the government does not allege a hate crime motivation enhancement under §3A1.1(a), that does not negate the seriousness of the threats that were overtly racial. The Defendant's word choice left damage on the Victim, that will reverberate throughout his life and require continued treatment.

### B. The History and Characteristics of the Defendant

The defendant's criminal history—with several prior misdemeanors and arrests—indicates that she poses a risk of recidivism, especially considering this is not the first instance in which she has been involved in making threats. PSIR ¶¶ 30-47. She has been convicted of theft, robbery, animal cruelty, and menacing, and has had prior arrests for threats crimes. PSIR ¶¶ 37-39, 41, 42, 46. Additionally, there have been multiple law enforcement contacts, including in 2014, 2015, and 2022, involving the defendant sending threatening messages and assault. PSIR ¶¶ 50-52. Each of these suggest incidents suggest a lack of impulse control and anger management, and that she may pose a significant risk of danger to the community. The defendant's mental and emotional health history, including multiple diagnosed mental health conditions, also suggest that she could pose an increased risk if those conditions are inadequately treated. PSIR ¶¶ 64-65.

That mental health history also weighs in favor of an extended supervised release term with appropriate mental health conditions to ensure that she is receiving the care that she needs. The government understands that the defendant may have difficult circumstances, including potentially feeling depressed or as a result of trauma she has endured. That said, those tests and challenges in life do not give anyone the right to terrorize others online. The government is hopeful that the defendant's purported insight into her mental health issues will allow her in the future to reengage with society in a healthy productive manner. Admittedly, the defendant's track record since her arrest, including her compliance with conditions, suggest that she has made some changes to her behavior and may mitigate her recidivism risk, which is why the Government advises that a low-end Guideline sentence is more appropriate under these circumstances.

### C. Respect for the Law, Just Punishment, and Deterrence

A Guideline term of imprisonment will also promote respect for the law, provide just punishment, and provide both specific deterrence to the defendant and general deterrence to the population at large. *See* 18 U.S.C. § 3553(a)(2). The requested sentence will serve as a general deterrent to those who engage in threatening behavior online and place others in reasonable fear of their safety. Those would-be criminals need to know that they cannot conspire to engage in threats online anonymously without being met with significant consequences. It will also serve as a specific deterrent to protect the public from the future crimes that Keeble would commit. If not for her arrest, Keeble may have continued to threaten individuals online with impunity.

A guideline prison sentence also reflects the appropriate sentencing range established by the Sentencing Guidelines and avoids unwarranted sentencing disparities among defendants. "[I]n the ordinary case, the Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough v. United States*, 552 U.S. 85, 89 (2007); *see Gall v. United States*, 552 U.S. 38, 46 (2007) (noting that the guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions"). Moreover, within-Guidelines sentences promote Congress's goal in enacting the Sentencing Reform Act: "to diminish unwarranted sentencing disparity." *Rita v. United States*, 551 U.S. 338, 354 (2007).

Those guidelines have been used and deemed reasonable by other federal courts, including in the Northern District of New York, in sentencing other defendants for similar threats offenses. *See, e.g.*, *United States v. McCarty*, 5:25-cr-00034-GTS (N.D.N.Y. June 13, 2025), ECF No. 26 (imposing guideline term imprisonment for mailing a letter that contained a threat to kill two New York State judges); *United States v. Bartlett*, 5:22-cr-00423-BKS (N.D.N.Y. March 30, 2023),

9

ECF No. 36 (imposing guideline term of imprisonment for mailing threatening letters to multiple people purporting to be the "Chinese Zodiac Killer"). The Court should avoid disparity among defendants and sentence Keeble to a Guideline sentence commensurate with her crime.

## IV.     CONCLUSION

Given the nature of this offense and the history and characteristics of this defendant, the United States recommends that the Court impose a sentence according to the Sentencing Guidelines, to include a low-end Guideline term of imprisonment of at least 5 months in prison followed by a supervised release term of three years that includes at least 5 months of home detention.

## V.     RESERVATION OF RIGHTS

The United States reserves the right to respond to arguments raised after this filing. The United States also requests that the Court provide the parties with any *ex parte* communications received by the Court in connection with sentencing, except for the confidential sentencing recommendations submitted by the United States Probation Office.

Dated: July 1, 2025                                           Respectfully submitted,

JOHN A. SARCONE III
United States Attorney

By:     */s/ Alexander P. Wentworth-Ping*
Alexander P. Wentworth-Ping
Assistant United States Attorney
Bar Roll No. 701897